# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

TONINO ACETO,
    Plaintiff,

v.

LINCOLN ELECTRIC COMPANY, et al.,
    Defendants.

)
)
)
)
)
)
)
)
)

Civil Action No. 04-12740 DPW

## DEFENDANTS' MOTION TO STAY

The undersigned defendants respectfully move to stay proceedings in this Court until the Judicial Panel on Multidistrict Litigation determines whether this "tag-along" action should be transferred to the United States District Court for the Northern District of Ohio for consolidated and coordinated pretrial proceedings as part of MDL No. 1535, In re Welding Rod Products Liability Litigation.  As set forth in the accompanying memorandum, staying this case will conserve judicial resources and promote the goals of MDL coordination, with no prejudice to plaintiff.

WHEREFORE, defendants respectfully request that the Court stay all proceedings in this matter.

Dated: December 30, 2004

Respectfully submitted,

By Its Attorneys,

*Wm. Shaw McDermott*

Wm. Shaw McDermott (BBO #330860)
Gregory R. Youman (BBO #648721)
Ashley Kline Handwerk (BBO# Pending)
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA 02109
(617) 261-3100

COUNSEL FOR DEFENDANTS AIRGAS-GULF STATES, INC., A.O. SMITH CORPORATION, THE BOC GROUP, INC., F/K/A AIRCO, INC., THE ESAB GROUP, INC., EUTECTIC CORPORATION, HOBART BROTHERS COMPANY, THE LINCOLN ELECTRIC COMPANY, PRAXAIR, INC., SANDVIK, INC., TDY INDUSTRIES, INC., UNION CARBIDE CORPORATION, UNION CARBIDE CORPORATION F/K/A UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, INC., VIACOM, INC. AND VIACOM, INC. AS SUCCESSOR BY MERGER TO CBS CORPORATION F/K/A WESTINGHOUSE ELECTRIC CORP.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TONINO ACETO,<br>    **Plaintiff,**<br><br>v.<br><br>LINCOLN ELECTRIC COMPANY, et al.,<br>    **Defendants.** | )<br>)<br>)<br>)<br>)    **Case No. \_\_\_ _____**<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY

The undersigned defendants respectfully move the Court to stay all proceedings in this matter pending a decision by the MDL panel regarding coordination of this case as part of MDL No. 1535, *In re Welding Rod Products Liability Litigation*. A brief stay until the transfer issue is resolved would promote efficiency and judicial consistency without prejudicing any party.

## I.   PROCEDURAL BACKGROUND

This is one of a number of cases filed against the movants and other alleged manufacturers, distributors, and industrial consumers of welding consumables such as welding rods. Welding fume actions have been filed throughout the country in state and federal courts, including in Arkansas, Georgia, Illinois, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Ohio, Pennsylvania, Texas, Utah, and West Virginia. In this case, like the others that have been coordinated in MDL No. 1535, the plaintiff alleges that:

- The various defendants either manufactured, distributed or conspired to conceal the alleged danger of welding products (*see* Compl. ¶¶ 39-44) (attached hereto as Exhibit 1);

- The ordinary and intended use of those products causes emission of fumes that contain manganese (*id.* ¶ 30); and

- Exposure to manganese from welding fumes has caused him and the purported class members a variety of injuries. (*Id.* ¶ 28, 35.)

As in other welding fume cases, the plaintiff also alleges that the defendants are liable for his alleged injuries and those of the putative class members under theories of breach of warranty, negligence, gross negligence, strict liability, and conspiracy. (*Id* ¶¶ 96-172.)

On June 23, 2003, the JPML consolidated and transferred three federal welding fume cases to the United States District Court for the Northern District of Ohio for coordinated pretrial proceedings before Judge Kathleen O'Malley. *See In re Welding Rod Products Liability Litigation*, 269 F. Supp. 2d 1365 (J.P.M.L. 2003) (JPML Transfer Order establishing MDL No. 1535). These proceedings were captioned MDL No. 1535, *In re Welding Rod Products Liability Litigation.* The Panel determined that MDL treatment "will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation" because:

> All actions present claims of personal injuries allegedly caused by exposure to welding fumes. The actions thus share factual questions concerning, inter alia, whether exposure to welding fumes causes the conditions complained of by plaintiffs and whether defendants knew or should have known of any health risks associated with exposure to welding fumes. Centralization under Section 1407 is thus necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary.

(Transfer Order at 2) (attached hereto as Exhibit 2).

There are currently over 3,000 claims pending in this MDL, each involving allegations and issues identical or similar to the ones in this case. *See* Welding Rod Product Liability Multidistrict Litigation, maintained by the U.S. District Court for the Northern District of Ohio, Eastern Division (last updated December 15, 2004) http://www.welding-rod-litigation.com/index.htm.

Defendants removed this action from state court on December 21, 2004. As soon as this case is assigned a case number and judge, defendants intend to promptly file a notice of tag-along action with the MDL Panel due to the similarity of allegations between the instant action and the other actions pending in MDL No. 1535.

## ARGUMENT

It is well settled that courts can – and should – stay cases pending MDL transfer, particularly at the beginning of a case when the possibility of prejudice is absent. It is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 229 U.S. 248, 254 (1936). 7 B C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 1792, at 293 (2d ed. 1986) ("when similar actions, either class or individual, are proceeding before several courts, one or more of the tribunals may stay the proceeding before it pending the outcome of the other action."); MANUAL FOR COMPLEX LITIGATION § 31.14 (3d ed. 1995) ("in appropriate cases, a judge may order an action stayed pending resolution of a related case in a federal court"). A stay is particularly appropriate when litigants have initiated the MDL process because coordination furthers judicial economy and eliminates the potential for conflicting pretrial rulings. *See, e.g., In re New York City Mun. Sec. Litig.*, 572 F.2d 49,

51-52 (2d Cir. 1978); *Good v. Prudential Ins. Co. of Am.*, 5 F. Supp.2d 804,809 (N.D. Cal. 1998); *In re Air Crash Disaster Off Long Island, N.Y.*, 965 F. Supp. 5, 7 (S.D.N.Y. 1997). These benefits would be lost if individual cases proceeded despite the pendency of an MDL proceeding, especially because they might saddle the MDL judge with inconsistent rulings. For this reason, "a majority of courts have concluded that it is often appropriate to stay preliminary pretrial proceedings while a motion to transfer and consolidate is pending with the MDL Panel because of the judicial resources that are conserved." *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1362 (C.D. Cal. 1997). *See also American Seafood, Inc.*, 1992 WL 102762 at *1; *Medical Society of the State of New York v. Connecticut General Corp.*, 187 F. Supp. 2d 89, 91 (S.D.N.Y. 2001).

District courts generally review three factors to decide whether to stay pending proceedings pending MDL transfer. These factors are: (1) hardship to the moving party if a stay is not granted; (2) potential prejudice to the non-moving party; and (3) the judicial resources that can be saved by avoiding duplicative litigation if the cases are consolidated. *See, e.g., Rivers*, 980 F. Supp. at 1360. Here, all three factors demonstrate the appropriateness of a stay. First, absent a stay, the defendants will be required to expend resources on pretrial matters that are already proceeding in a coordinated manner in the MDL proceeding. Denying the stay would result in hardship and inequity to defendants if they are forced to litigate the same threshold issues multiple times in multiple courts while they wait for a transfer to the welding fume MDL. *See American Seafood, Inc.*, 1992 WL 102762 at *2 ("The duplicative motion practice and discovery proceedings demonstrate that judicial economy and prejudice to defendants weigh heavily in favor of the stay.").

Second, given the early stage of this litigation, plaintiff cannot credibly argue that a stay would be prejudicial. *See The Republic of Venezuela v. Philip Morris Cos., Inc.*, No. 99-0586-Civ-Ungaro-Benages, 1999 U.S. Dist. LEXIS 22742, at *5-7 (S.D. Fla. Apr. 28, 1999) (finding plaintiffs will not be prejudiced by a stay of all proceedings, including motion to remand, pending consideration of an MDL motion); *Weinke v. Microsoft Corp.*, 84 F. Supp. 2d 989, 990 (E.D. Wisc. 2000) (rejecting plaintiff's "cursory assertions of prejudice" in granting stay). Moreover, tag-along proceedings generally move quickly and thus a stay would not materially delay the litigation. *See, e.g., Good*, 5 F. Supp. 2d at 808 (granting a stay where "a stay pending a final decision by the MDL Panel would likely be brief"); *Tench*, 1999 WL 1044923, at *2 (granting a stay as plaintiff would suffer no prejudice from the short delay); *American Seafood, Inc.*, 1992 WL 102762 at *1. In any event, the long-term benefits of MDL coordination greatly outweigh the minimal short-term costs of a delay.

Finally, issuance of a stay would conserve judicial resources by avoiding potential duplication of hearings, conferences, and filings. *See Egon v. Del-Val Fin. Corp.*, Civ. A. No. 90-4338, 1991 WL 13726, at *1 (D. N.J. Feb. 1, 1991) ("[E]ven if a temporary stay can be characterized as a delay prejudicial to plaintiffs, there are considerations of judicial economy and hardship to defendants that are compelling enough to warrant such a delay."); *Rosenfeld v. Hartford Fire Ins. Co.*, Civ. A. Nos. 88-2153, 88-2252, 1988 WL 49065, at *2 (S.D.N.Y. May 12, 1988). This Court and others around the country should not waste resources duplicating each others' work when common issues among welding fume cases can be resolved in a coordinated manner by the MDL court.

In short, granting a stay of this matter will minimize waste, avoid inconsistent decisions and thus promote the purpose of MDL proceedings like the one that has been established here.

## **CONCLUSION**

For the foregoing reasons, the undersigned defendants respectfully request that the Court stay all proceedings in this matter pending a determination by the MDL Panel whether to transfer this action to the MDL court.

Dated:  December 30, 2004

Respectfully submitted,

By Its Attorneys,

*Wm. Shaw McDermott*

Wm. Shaw McDermott (BBO #330860)
Gregory R. Youman (BBO #648721)
Ashley Kline Handwerk (BBO# Pending)
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA  02109
(617) 261-3100

COUNSEL FOR DEFENDANTS AIRGAS-GULF STATES, INC., A.O. SMITH CORPORATION, THE BOC GROUP, INC., F/K/A AIRCO, INC., THE ESAB GROUP, INC., EUTECTIC CORPORATION, HOBART BROTHERS COMPANY, THE LINCOLN ELECTRIC COMPANY, PRAXAIR, INC., SANDVIK, INC., TDY INDUSTRIES, INC., UNION CARBIDE CORPORATION, UNION CARBIDE CORPORATION F/K/A UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, INC., VIACOM, INC. AND VIACOM, INC. AS SUCCESSOR BY MERGER TO CBS CORPORATION F/K/A WESTINGHOUSE ELECTRIC CORP.

Westlaw.

269 F.Supp.2d 1365
269 F.Supp.2d 1365
**(Cite as: 269 F.Supp.2d 1365)**

Page 1

**H**
Judicial Panel on Multidistrict Litigation.

In re WELDING ROD PRODUCTS LIABILITY
LITIGATION

**No. 1535.**

June 23, 2003.

Plaintiffs moved to consolidate and centralize for pretrial proceedings three actions and 19 potential tag-along actions against manufacturers of welding equipment, pending in five districts, which alleged personal injuries caused by exposure to welding fumes. The Judicial Panel on Multidistrict Litigation, Wm. Terrell Hodges, Chairman, held that (1) consolidation and centralization was warranted, and (2) transfer of consolidated actions to Northern District of Ohio was appropriate.

Transfer ordered.

West Headnotes

**[1] Federal Civil Procedure** ☞9
170Ak9 Most Cited Cases
Consolidation and centralization for pretrial proceedings, of three actions in multidistrict litigation against manufacturers of welding equipment, alleging personal injuries caused by exposure to welding fumes, was warranted; actions involved common questions of fact, centralization would serve convenience of the parties and witnesses and promote just and efficient conduct of the litigation, and was necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary. 28 U.S.C.A. § 1407.

**[2] Federal Courts** ☞152.5
170Bk152.5 Most Cited Cases
(Formerly 170Bk152)
Transfer of three actions, pending in multidistrict litigation and consolidated for pretrial proceedings, against manufacturers of welding equipment, alleging personal injuries caused by exposure to welding fumes, to Northern District of Ohio, was appropriate; all responding parties agreed to centralization in that district, corporate headquarters for several defendants were located in district, and judge was an able jurist with experience in multidistrict products liability

litigation. 28 U.S.C.A. § 1407.
**\*1366** Before WM. TERRELL HODGES, Chairman, JOHN F. KEENAN, BRUCE M. SELYA, [FN*] JULIA SMITH GIBBONS, D. LOWELL JENSEN, J. FREDERICK MOTZ * and ROBERT L. MILLER, Jr., Judges of the Panel.

> FN* Judges Selya and Motz took no part in the decision of this matter.

***TRANSFER ORDER***

WM. TERRELL HODGES, Chairman.

This litigation currently consists of the two actions in the Eastern District of Louisiana and one action in the Southern District of Mississippi as listed on the attached Schedule A. [FN1] Before the Panel is a motion, pursuant to 28 U.S.C. § 1407, brought by plaintiffs in one Eastern District of Louisiana action for coordinated or consolidated pretrial proceedings of these three actions. Moving plaintiffs initially supported centralization in either the Eastern District of Louisiana or the Southern District of Mississippi. Defendant Caterpillar, Inc., expressly takes no position with respect to the motion. All other responding defendants [FN2] support the motion for transfer, but suggest the Northern District of Ohio as transferee district. At oral argument, moving plaintiffs asserted that they now support the Northern District of Ohio as transferee district as well. Plaintiffs in one action and one potential tag-along action in the Southern District of Mississippi, as well as plaintiffs in various state court actions, initially opposed the motion; however, at oral argument, representatives for some, if not all, of these plaintiffs stated that they now also support centralization in the Northern District of Ohio.

> FN1. In addition to the actions presently before the Panel, the parties have identified nineteen related actions pending as follows: ten actions in the Eastern District of Louisiana, five actions in the Southern District of Mississippi, two actions in the Western District of Louisiana, and one action each in the Northern District of Illinois and the Middle District of Louisiana. These actions and any other related actions will be treated as potential tag-along actions. See Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

269 F.Supp.2d 1365
269 F.Supp.2d 1365
**(Cite as: 269 F.Supp.2d 1365)**

FN2. Lincoln Electric Company; Praxair, Inc.; Union Carbide Corporation f/k/a Union Carbide Chemicals and Plastics Company, Inc.; Sandvik, Inc.; The ESAB Group, Inc.; Allegheny Technologies Incorporated f/k/a TDY Industries, Inc. f/k/a Teledyne Industries, Inc.; Eutectic Corporation; Hobart Brothers Company; A.O. Smith Corporation; The BOC Group, Inc. f/k/a Airco, Inc.; Viacom, Inc., successor by merger to CBS Corporation f/k/a Westinghouse Electric Corporation; and Airgas-Gulf States, Inc. f/k/a Gulf States Airgas, Inc.

[1] On the basis of the papers filed and hearing session held, the Panel finds that these three actions involve common questions of fact, and that centralization under Section 1407 in the Northern District of Ohio will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. All actions present claims of personal injuries allegedly caused by exposure to welding fumes. The actions thus share factual questions concerning, inter alia, whether **\*1367** exposure to welding fumes causes the conditions complained of by plaintiffs and whether defendants knew or should have known of any health risks associated with exposure to welding fumes. Centralization under Section 1407 is thus necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary.

[2] We are persuaded that the Northern District of Ohio is an appropriate transferee forum for this litigation. We observe that all responding parties now agree upon centralization in this district, and that the corporate headquarters for several of the defendants are located within this district, meaning relevant witnesses and documents will likely be found there. We also note that the judge to whom we are assigning these actions is an able jurist with experience in multidistrict products liability litigation.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on the attached Schedule A are transferred to the Northern District of Ohio and, with the consent of that court, assigned to the Honorable Kathleen McDonald O'Malley for coordinated or consolidated pretrial proceedings.

## SCHEDULE A

*MDL-1535--In re Welding Rod Products Liability Litigation*

*Eastern District of Louisiana*
  *Albert Weathersby, et al. v. Lincoln Electric Co., et al.,* C.A. No. 2:03-398
  *Clarence Variste, Jr. v. Lincoln Electric Co., et al.,* C.A. No. 2:03-487

*Southern District of Mississippi*
  *Charles M. Ruth, et al. v. Lincoln Electric Co., et al.,* C.A. No. 3:02-406

269 F.Supp.2d 1365

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, SS**

CIVIL ACTION
NO. O
4 - 4434

**TONINO ACETO**

**v.**

**LINCOLN ELECTRIC COMPANY, HOBART
BROTHERS COMPANY, ILLINOIS TOOL
WORKS, THE ESAB GROUP, INC. et al**

:
:
:
:
:
:
:

## CLASS ACTION COMPLAINT

Plaintiff, individually and on behalf of all others similarly situated, by their undersigned attorneys, allege upon information and belief, the following:

## PARTIES

1.     TONINO ACETO, is an adult citizen and a resident 45 Lincoln Street, Malden, MA 02148, in the County of Middlesex (North), State of Massachusetts.

2.     Defendant Lincoln Electric Company ("Lincoln"), is a corporation incorporated under the laws of Ohio that is qualified to do business in Massachusetts and doing business in Massachusetts, with C.T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

3.     Defendant Hobart Brothers Company ("Hobart"), is a corporation incorporated under the laws of Ohio that is qualified to do business in Massachusetts and doing business in Massachusetts, with C.T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

4.      Defendant Illinois Tool Works, Inc. ("Illinois Tool Works"), is a corporation incorporated under the laws of Delaware that is qualified to do business in Massachusetts and doing business in Massachusetts, with C.T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

5.      Defendant The ESAB Group, Inc. ("ESAB"), is a corporation incorporated under the laws of Ohio that has done and is doing business in Massachusetts but is not qualified to do business in Massachusetts, with The Corporation Trust Company, The Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801, as its agent for service of process.

6.      Defendant Select-Arc, Inc. ("Select-ARC"), is a corporation incorporated under the laws of Ohio that has done and is doing business in Massachusetts but is not qualified to do business in Massachusetts, with Paul E. Zimmer, 2700 Ketting Tower, 40 N. Main St., Dayton, OH 45423, as its agent for service of process.

7.      Defendant The National Electric Manufacturers Association ("NEMA"), is a trade organization comprised of manufacturers that has a section devoted to the manufacturer of welding products known as "NEMA Electric Welding Section" or "NEMA Arc Welding Section" and located at 1300 N. 17th Street, Suite 1847, Rosslyn, VA 22209.

8.      Defendant The Ferroalloys Association ("TFA"), is an association and industry advocacy group that includes the producers of chromium, manganese, silicone, and vanadium ferroalloys that sponsored a manganese

2

subcommittee that includes representative from welding manufacturers, the AWS, and the NEMA. Their current address is Valenova.

9.     Defendant Airco, Inc., ("Airco"), now known as The BOC Group, Inc., is a corporation incorporated under the laws of Delaware that is qualified to do business in Massachusetts and doing business in Massachusetts, with C. T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

10.     Defendant Praxair, Inc. ("Praxair"), is a corporation incorporated under the laws of Delaware that is qualified to do business in Massachusetts and doing business in Massachusetts, with The Hall Corporation System, Inc, 285 Liberty Street NE, Boston, MA 02110,, as its agent for service of process.

11.     Defendant TDY Industries, Inc. ("Teledyne"), formerly known as Teledyne Industries, Inc., is a corporation incorporated under the laws of California that is qualified to do business in Massachusetts and doing business in Massachusetts, with C. T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

12.     Defendant Viacom, Inc. ("Viacom"), is a corporation incorporated under the laws of Delaware that is qualified to do business in Massachusetts and doing business in Massachusetts. Their current address is Valenova.

13.     Defendant Westinghouse Electric Corporation ("Westinghouse"), now known as CBS Corporation, is a corporation incorporated under the laws of Pennsylvania that is qualified to do business in Massachusetts and doing business

3

in Massachusetts, with C.T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

14.    Defendant Caterpillar, Inc. ("Caterpillar"), is a corporation incorporated under the laws of Delaware that is qualified to do business in Massachusetts and doing business in Massachusetts, with C.T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

15.    Defendant General Electric Company ("General Electric"), is a corporation incorporated under the laws of New York that is qualified to do business in Massachusetts and doing business in Massachusetts, with C.T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

16.    Defendant Union Carbide Corporation ("Union Carbide"), is a corporation incorporated under the laws of New York that is qualified to do business in Massachusetts and doing business in Massachusetts, with C.T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

17.    Defendant Union Carbide Chemicals and Plastics Company, Inc. ("Union Carbide Chemicals"), now known as Union Carbide Corporation, is a corporation incorporated under the laws of New York that is qualified to do business in Massachusetts and doing business in Massachusetts, with C.T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

4

18.     Defendant Eutectic Corporation ("Eutectic"), is a corporation organized under the laws of New York that has done and is doing business in Massachusetts, but is not qualified to do business in Massachusetts, with Corporation Service Company, 327 Hillsborough Street, Raleigh, North Carolina 27603, as its agent for service of process and Mitchell Moser, Esq., Quarles & Brady, PLLC, 411 East Wisconsin Ave., Suite 2040, Milwaukee, WI 53202.

19.     Defendant A. O. Smith Corporation ("Smith"), is a corporation incorporated under the laws of New York that is qualified to do business in Massachusetts and doing business in Massachusetts, and its successor in interest St De Aosco, Inc., with Prentice-Hall Corporation System, The Prentice Hall Corporation System, Registered Agent, 285 Liberty Street NE, Boston, MA 02110, as its agent for service of process.

20.     Defendant Sandvik, Inc. ("Sandvik"), is a corporation incorporated under the laws of Delaware that has done and is doing business in Massachusetts, but is not qualified to do business in Massachusetts, with C. T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

21.     Defendant Deloro Stellite Company, Inc. ("Deloro"), is a corporation incorporated under the laws of Delaware that has done and is doing business in Massachusetts, but is not qualified to do business in Massachusetts, with C. T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

5

22.     Defendant Miller Electric Manufacturing Co., Inc. ("Miller Electric"), is a corporation incorporated under the laws of Wisconsin that has done and is doing business in Massachusetts, with C.T. Corporation System, 44 E. Mifflin St., Madison, WI 53703, as its agent for service of process.

23.     Defendant J. W. Harris Co., Inc. ("J. W. Harris"), is a corporation incorporated under the laws of Ohio that has done and is doing business in Massachusetts, with Stephen M. Nechemias, 425 Walnut St., No. 1800, Cincinnati, OH 45202, as its agent for service of process.

24.     Defendant Industrial Welding Supplies of Hattiesburg, Inc. ("Industrial Welding"), formerly known as Nordan Smith, is a corporation incorporated under the laws of Mississippi doing business in Massachusetts whose agent for service of process is C.T. Corporation System, 2 Oliver Street, Boston, MA 02109.

25.     Defendant Airgas-Gulf States, Inc. ("Airgas"), is a corporation incorporated under the laws of Delaware that is qualified to do business in Massachusetts and doing business in Massachusetts, with C. T. Corporation System, 2 Oliver Street, Boston, MA 02109, as its agent for service of process.

26.     Defendant John Doe Defendants A-Z, whose identities are unknown to the Plaintiffs at this time, but when those parties' true identities are discovered, the pleadings will be amended by substituting their true names and giving proper notice to these parties, pursuant to the L.C.C.P. These Defendants include sellers, suppliers, distributors, and manufacturers that, at any time relevant to these proceedings, supplied welding equipment, supplies, and steel/metal products

6

containing manganese to various suppliers in or about Boston, Massachusetts, and also include unknown members of AWS, NEMA and TFA, whose negligence and breaches caused or contributed to cause the Plaintiffs' damages and injuries.

## CLASS ALLEGATIONS

27.    This action is brought by Tonino Aceto, individually and on behalf of those similarly situated who sustained direct and/or consequential affects, injury and damage as a result of the exposure to welding fumes containing the air borne metal/chemical/substance manganese.

28.    The plaintiff referenced above on his own behalf and as representative of a class of Massachusetts plaintiffs defined as follows:

> All persons and their spouses who reside and/or work and/or worked in the Commonwealth of Massachusetts and are or were exposed to welding fumes containing the air borne metal/chemical/substance manganese, and who sustained direct and/or consequential personal injury, fear, fright, or other damage or compensable affect.

## FACTS

29.    Over the years, Tonino Aceto and persons similarly situated but as yet unidentified, were exposed to toxic fumes resulting from welding while at work.

30.    The ordinary and intended use of welding products will cause emissions of fumes that contain manganese ("welding fumes").

31.    Since 1837, manganese has been medically recognized as toxic to the human central nervous system in levels that exceed the trace amounts normally found in the human body.

7

32.    Toxicity of manganese causes progressive, disabling neurological damage referred to as manganese poisoning.

33.    People who suffer from manganese poisoning suffer from debilitating neurological problems that affect their ability to think, talk, eat, move, sleep, and work.

34.    Workers exposed to welding fumes are exposed to manganese primarily through inhalation. Manganese exposure for a period as short as 49 days can cause manganese poisoning and progressive, disabling, neurological damage.

35.    While working, Tonino Aceto and each member of the Putative Class was exposed to manganese rich welding fumes while using welding products and equipment or working in the proximity of other persons using welding products or equipment.

36.    Consequently, Plaintiffs and those similarly situated are entitled to medical monitoring at the expense of Defendants.

37.    As a direct and proximate result of exposure to the manganese rich welding fumes, Tonino Aceto and each member of the Putative Class represent they have developed symptoms indicative of the condition known as manganism and/or manganese poisoning and/or Parkinson-like Syndrome (closely resembling but different from Parkinson's Disease).

38.    As a direct and proximate result of exposure to manganese rich welding fumes, Tonino Aceto and each member of the Putative Class of American workers he represents have suffered related permanent neurological and physical

8

damage, severe physical and mental pain, loss of wages, loss of earning capacity, disability, medical expenses, and loss of enjoyment of life in varying degrees.

39.      At all relevant times, Tonino Aceto and each member of the Putative Class they represent (hereinafter "Plaintiffs") were kept ignorant of the dangerous nature of welding fumes, manganese, and the neurological injuries that could occur because of exposure to manganese rich welding fumes.

40.      Any reasonable person, including Tonino Aceto and each member of the Putative Class, if adequately informed of the hazards of exposure to welding fumes, would not have willingly exposed themselves to such welding fumes in workplaces without necessary precautionary measures.

41.      All of the Defendants are or were manufacturers, sellers, suppliers or large industrial consumers of welding products.

42.      Through industry and medical studies, unknown to Tonino Aceto and each member of the Putative Class, the Defendants knew or should have known of the health hazards inherent in the products they were selling, distributing, or using.

43.      The Defendants concealed and/or ignored that information, and/or condoned the concealment, and/or advised, encouraged, or aided others and/or each other to do so, in order to sell their products and/or avoid the costs of safety precautions, and/or avoid litigation by people injured by welding fumes. The actions or inactions demonstrate a reckless disregard for the rights and safety of this class of blue collar working Americans.

9

44.    The Defendants committed numerous tortuous acts that included knowingly and/or negligently misrepresenting, concealing, suppressing, and omitting material information about the health effects of magnesia rich welding fumes and precautionary measures as specifically alleged below.

45.    NEMA is a trade organization comprised of manufacturers that has a section devoted to the manufacturers of welding products known as "NEMA Electric Welding Section" or "NEMA Arc Welding Section" ("NEMA Welding Section").

46.    TFA is an industry advocacy group consisting of producers of chromium, manganese, silicon, and vanadium ferroalloys that sponsored a manganese subcommittee that includes representatives from welding manufacturers and the AWS and NEMA. The TFA's membership included management representatives of companies that produce welding products and consumers that purchase large quantities of the products for use in their operations.

47.    The Defendants created committees within these trade organizations and then used the committees to negligently misrepresent, conceal, suppress, and omit material information about the health effects of welding fumes and necessary precautionary measures.

48.    Specific examples of the trade association committees controlled by Defendants and their activities are identified below.

49.    The Defendants controlled and used the committees to conceal the dangers from people exposed to welding fumes by:

10

A. limiting individual membership on relevant committees exclusively or primarily to employees of the Defendants or their designated representatives;

B. maintaining, through Defendants' delegates, majority or exclusive voting control of the committees at all times;

C. selecting the assignments or proposals considered by each committee;

D. funding projects chosen by Defendants;

E. using the Defendants' delegates to prepare the written records of the business transacted by each committee; and/or

F. reviewing and editing, to the satisfaction of the Defendants, studies performed by consultants hired by the committees.

50.    From at least 1937 to the present, the Defendants, by their actions and through trade association committees they controlled, undertook studies, issued product labels and other health and safety information, and issued specifications and standards for ventilation, safety equipment, and other precautionary measures.

51.    At all times, the Defendants acted to conceal the health hazards of welding fumes, and specifically manganese, knowing that their studies, publications, specifications, and standards would be adopted and relied upon by manufacturers, sellers, and consumers of large amounts of welding products as the authoritative source for warnings, instructions, and precautionary measures printed on product labels and otherwise distributed in the stream of commerce.

52.    The Defendants had actual knowledge about the causal relationship between manganese-containing welding fumes and neurological injury.  The Defendants unfairly and deceptively concealed this information from workers exposed to welding fumes.

53.    The causal connection between neurological injuries and welding fumes containing manganese has been scientifically documented since 1932.

54.    In 1932, a medical article was published documenting two cases of welders with neurological injury caused by manganese poisoning from welding fumes. The copy of this article or a summary of the medical article was received in the libraries of each Defendant.

55.    In 1937, NEMA's Welding Section received further notice of the contents of the 1932 medical article through a welding safety booklet published by an insurance company stating that manganese in welding fumes "causes a disease similar to *paralysis agitans* [Parkinson's disease]."

56.    In 1944, NEMA's Welding Section received notice of a claim of manganese poisoning in a welder.

57.    In 1958, the AWS-sponsored Z49 Committee issued a technical document, (not intended for use by welders) approved by the AWS Technical Committee, an oversight committee for AWS activities, reflecting its knowledge that manganese in welding fumes is a potentially toxic substance.

58.    In 1966, at a meeting of a task group of the AWS Filler Metal Committee, members of the committee reviewed an industrial hygiene article

identifying manganese as a toxic substance in welding fumes, and the Committee discussed neurological injuries in welders.

59.    In 1970, the AWS Task Group on Welding Fumes received notice, through a literature search submitted by a consultant hired by the Task Group on Welding Fumes, that welding fumes could cause neurological damage (magnesia) due to manganese poisoning, and that the symptoms of manganese poisoning resemble the symptoms of Parkinson's Disease.

60.    In 1970, the AWS Task Group on Welding Fumes received notice, through a welding fume study conducted by a consultant hired by the Task Group on Welding Fumes, that welding fumes could easily exceed the recommended occupational exposure guidelines, even when ventilation standards specified by Defendants were followed.

61.    Beginning in the late 1970s, the AWS Safety and Health Committee received notice of claims of welders suffering neurological injuries from manganese in welding fumes.

62.    In 1978, the AWS Safety and Health Committee received notice, through a literature search report submitted by a consultant hired by the Committee, that welders can suffer neurological damage from manganese in welding fumes. A portion of this report is quoted below:

> "Although a number of cases...have been reported, there are no recent studies reported in the literature which explore the magnitude of the problem of chronic manganese poisoning in welders. In future epidemiological studies of various welding populations, the prevalence of this disease should be investigated....

13

63.     Early symptoms of chronic manganism include restlessness, irritability and a tendency to laugh or cry without purpose. These symptoms may be followed by apathy, visual hallucinations, uncontrollable impulse, and flight of ideas, mental confusion or euphoria.

64.     Mask-like facial expression, spastic grin, muscle rigidity, slow gait with sliding of the feet, increased and abnormal reflexes, monotonous blurred speech with poor articulation, tremors, irregular handwriting, impaired hearing, double vision, abnormal reactions to pain, touch, heat and pressure, excessive salivation and perspiration, sexual impotence and diminution of libido have been described by various authors.... Mental activity is reported to be slowed, judgment impaired and memory weakened, but intelligence remains normal.

65.     The observation that manganism resembles Parkinson's Disease deserves emphasis. Although no data on the prevalence of Parkinsonism in welders are available, there is a concern that some cases of manganese poisoning could be mistakenly diagnosed as Parkinson's Disease. Further investigations may be warranted.

66.     Manganism, like Parkinsonism, responds favorably to treatment with the drug levodopa (L-dopa), indicating that the two diseases may share certain biological abnormalities: depletion of dopamine (a neurotransmitter in the basal ganglia of the brain) and depletion of melanin pigment content of the nerve cells of the substantial nigra, also in the brain."

14

67.    In 1978, the same consultant described above reported to the AWS Safety and Health Committee that manganese poisoning from welding fumes could be misdiagnosed as idiopathic Parkinson's Disease, and that the problem was so widespread that it required an epidemiological study.

68.    In 1979, the AWS Research Committee and the AWS Executive Committee on Safety and Health concluded that there was sufficient evidence to justify the funding of an epidemiological study that would include the study of neurological problems in welders. The committee voted to undertake this epidemiological study, although it was never completed.

69.    In 1983, the AWS Safety and Health Committee received notice through an independent literature search that manganese poisoning is "readily confused with Parkinson's Disease," and also that in a study in India, 40% of the welders studied suffered "neurological injury."

70.    Beginning in the late 1970s and early 1980s, the Defendants through the AWS Safety and Health Committee and NEMA Welding Section sponsored "Industry Defense Committee," receiving notice of claims of manganese poisoning filed as lawsuits against companies in the welding industry.

71.    In 1984, the chairperson of the AWS Safety and Health Committee admitted "manganese fumes can cause a disease quite similar to Parkinson's Disease after six months to two years of exposure." The Defendants were aware of this admission.

72.    Beginning in 1985 and continuing to the present, Defendants admitted in their Material Safety Data Sheets ("MSDS"), which are technical

15

documents of limited distribution, their knowledge that manganese in welding fumes could cause neurological damage.

73.    Because not all Defendants attended each meeting, it was a regular practice of the trade association committees to publish written minutes that were disseminated to all committee members including those not in attendance, for the purpose of ratifying and adopting the actions taken and decisions made at the meetings.

74.    At a meeting of NEMA's Welding Section held on March 16, 1937, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards associated with welding fumes by forming a "Dust and Smoke Committee" to preempt investigation of welding fume hazards by independent sources that were not controlled by the Defendants.

75.    During meetings of NEMA's Welding Section held between January 20 and June 23, 1938, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by changing the language of a publication issued by an insurance company to delete the original statement in the publication that manganese in welding fumes causes a disabling illness similar to Parkinson's Disease.

76.    In 1939-40, at meetings of NEMA's Welding Section, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the hazards of welding fumes by purporting to undertake an investigation of the health hazards of welding fumes and then, upon its completion, changing the

16

conclusions of the study, so as to falsely represent that welding fumes were not harmful to welders.

77.    In 1949, as part of a scheme to create and disseminate false evidence useful in defending against claims brought by persons injured by exposure to welding fumes, Defendant members of NEMA's Arc Welding Section agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by providing information for and causing publication in a welding trade journal of a two-part article that made the misrepresentation that welding fumes were not toxic.

78.    In 1949 and 1951, at meetings of NEMA's Arc Welding Section which considered precautionary measures, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products because the Defendants feared that welders would be afraid to use welding products if they saw precautionary product labels, and therefore sales of welding products would be reduced.

79.    In 1952, the Defendants reorganized the AWS Safety Recommendations Committee and called a meeting to consider the furnishing of safety and health information at which they agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products.

80.    In 1952, at a meeting of the AWS Safety Recommendations Committee, the Defendants in attendance agreed to, and did intentionally,

17

knowingly, and recklessly adopt a policy of refuting existing reports of welding fume hazards by publishing their own reports that misrepresented exposure to welding fumes as safe.

81.     In 1957, the Defendants agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by sponsoring the publication of an article in the *Welding Engineer* trade publication that made the misrepresentation that "toxic gases are not produced by electrode coatings."

82.     In 1966, at meetings of the AWS A5 Filler Metal Committee and a task group, the Defendants in attendance intentionally, knowingly, and recklessly agreed to publication in a trade journal of an article misrepresenting the health hazards of welding fumes as causing only "temporary disability."

83.     In 1966, at meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by establishing industry-wide specifications for precautionary product labels that failed to warn workers of the danger of manganese in welding fumes. This precautionary label stated:

> Welding may produce fumes and gases hazardous to
> health. Avoid breathing these fumes and gases. Use
> adequate ventilation. See USAS Z49.1 "Safety in
> Welding & Cutting," published by the American Welding
> Society.

84.     In 1966, at meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, the Defendants in attendance established industry-wide specifications for precautionary product labels which did

18

intentionally, knowingly, and recklessly omit instructions about necessary ventilation, precautionary measures, and other information, needed to protect workers against the toxic effect of manganese.

85.     In 1966-67, through votes on a ballot distributed to the Defendants through the A5 Filler Metal Committee of the AWS, the Defendants did intentionally, knowingly, and recklessly approve, as part of the AWS required specifications for most welding products, a precautionary product label concealing health hazards from welding fumes and omitting instructions about necessary ventilation, precautionary measures, and other information.

86.     From 1975-79, the Defendants, through the AWS Committee on Safety and Health, did intentionally, knowingly, and recklessly conceal the known hazards of welding fumes by providing information that misrepresented the hazards associated with welding fumes as part of a deliberate scheme to prevent an independent standard-setting organization from lowering the occupational exposure guidelines for iron oxide and general welding fumes.

87.     In 1979, at meetings of a joint AWS-NEMA committee consisting of a special Task Group of the A5 Filler Metal Committee of the AWS and the Labeling and Safe Practices Committee of NEMA's Arc Welding Section, Defendants intentionally, knowingly, and recklessly established industry-wide specifications for precautionary product labels that concealed the health hazards of welding fumes by omitting any reference to the toxic effects of manganese in welding fumes.

88.     In 1979, at meetings of a joint AWS-NEMA committee consisting of a special Task Group of the A5 Filler Metal Committee of the AWS and the Labeling

19

and Safe Practices Committee of NEMA, the Defendants did intentionally, knowingly, and recklessly establish industry specifications for precautionary measures and other information needed by workers to protect against the toxic effects of manganese in welding fumes.

89.    In 1979, through votes on a ballot distributed to the Defendants through the AWS-NEMA Joint Committee On Precautionary Labels and the A5 Filler Metal Committee of the AWS, the Defendants did intentionally, knowingly, and recklessly approve as part of the required industry-wide specifications for most welding products a precautionary product label concealing health hazards and omitting instructions about necessary ventilation, precautionary measures, and other information. This precautionary label stated in pertinent part:

"WARNING: Protect yourself and others. Read and understand this label.

FUMES AND GASES can be dangerous to your health.

Read and understand the manufacturer's instructions and your employer's safety practices.

Keep your head out of the fumes.

Use enough ventilation, exhaust at the arc, or both, to keep the fumes and gases from your breathing zone, and the general area.

See American National Standard Z49.1 "Safety in Welding and Cutting" published by the American Welding Society."

20

90.    Beginning in 1979 and continuing until the present time, at meetings of the AWS Technical Council and Board of Directors, the Defendants in attendance did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by failing and refusing to perform an epidemiological study, recommended by other AWS committees and an independent consultant retained by the Defendants, to investigate the neurological effects of welding fumes on persons exposed to welding fumes.

91.    In 1980, at meetings of NEMA's Ad Hoc Committee on Precautionary Labeling, the Defendants in attendance did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by approving industry specifications for precautionary product labels for welding power sources that omitted reference to the toxic effects of manganese in welding fumes on persons exposed to welding fumes.

92.    Beginning in 1980, at meetings of the NEMA Ad Hoc Committee on Precautionary Labeling, the Defendants in attendance did intentionally, knowingly, and recklessly approve industry specifications for precautionary product labels for welding power sources that omitted necessary instructions about ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

93.    Beginning in 1980 and continuing until 1996, at meetings of the NEMA MSDS Task Force Committee and the AWS SH-4 Ad Hoc Committee on Suggestions and Changes to NEMA Publication EW 5-1982, the Defendants in attendance did intentionally, knowingly, and recklessly agree to conceal health

hazards of welding fumes by adopting a recommended format for the Hazardous
Material and Health Hazard Data sections of the Material Safety Data Sheets
(MSDS) for welding products that omitted reference to the manganese content of
welding fumes, the neurological damage caused by manganese in welding fumes,
and necessary instructions for protection against the health hazards of welding
fumes.

94.    Beginning in 1993 and continuing to the present time, the
Defendants, through the AWS Safety and Health Committee and NEMA Welding
Section, did intentionally, knowingly, and recklessly seek to conceal the health
hazards of manganese in welding fumes by appointing designated representatives
to become committee members of, and providing funding for, a trade organization
called The Ferroalloys Association ("TFA"), which opposes restrictions on the
guidelines for manganese exposure levels established by various authorities.

95.    In 1993-95, the Defendants, through the above described
organization sponsored by the AWS Safety and Health Committee and NEMA
Welding Section, as part of a scheme to prevent the lowering of occupational
exposure guidelines for manganese in welding fumes established by the American
Conference of Governmental Industrial Hygienists ("ACGIH"), did intentionally,
knowingly, and recklessly seek to conceal the health hazards of manganese in
welding fumes by providing false and misleading information that exposure to
manganese in welding fumes did not cause neurological injury.

## FIRST CLAIM FOR RELIEF
### ( Negligence)

96.    Plaintiff and the putative class realleges paragraphs 1-95 as if fully set forth herein.

97.    At all relevant times, it was reasonably foreseeable by the Defendants that welders including the Plaintiff, and persons in proximity to welding fumes, including those similarly situated, would be exposed to welding fumes containing manganese by using welding products or working in proximity of other workers using welding products.

98.    The Defendants assumed a duty to exercise reasonable care for the safety of the Plaintiffs and those they represent in putting their product into the street of commerce with internal labeling and warning.

99.    Because exposure to welding fumes presents a risk of physical harm, all Defendants had a legal duty to exercise reasonable care for the safety of the Plaintiffs and those similarly situated that they represent when making representations about welding safety and health in warning labels, publications, and instructions for ventilation and other precautionary measures.

100.    The Defendants knew, or in the exercise of ordinary care should have known, that persons exposed to welding fumes would act in reliance upon representations made by the Defendants about the health hazards associated with welding fumes and the precautionary measures required to protect against those health hazards.

23

101.    The Defendants knew, or in the exercise of ordinary care should have known, that welding fumes would cause neurological damage to workers like Plaintiffs and those similarly situated but as yet unidentified.

102.    The Defendants breached their duty of reasonable care and were negligent.

103.    Beginning in 1970, the Defendants violated OSHA standards about publication of information about health hazards through MSDS guidelines that omitted necessary instructions about target organs, ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

104.    The Defendants violated industry standards about health and safety as set forth in the Z49 documents adopted by the AWS sponsored Z49.1 committee beginning in 1950 by failing to publish adequate warning of precautionary instructions and other information to welders or persons in the proximity of welding fumes about the standard.

105.    As a direct and proximate result of the Defendants' negligent acts and omissions, Plaintiff Tonino Aceto and those similarly situated suffered, and continue to suffer, severe neurological injuries which will require medical monitoring of the Plaintiffs. Plaintiffs' spouse and the similarly situated class members suffered damages for loss of consortium.

106.    WHEREFORE, the Plaintiff demands judgment in an amount deemed just and reasonable plus interest and costs against the Defendants.

24

## SECOND CLAIM FOR RELIEF
### (Negligence – Sale of Product)

107.    Plaintiff and the putative class realleges paragraphs 1-106 as if fully
set forth herein..

108.    Lincoln, ESAB, Select-ARC, Hobart, Illinois Tool Works, Airco,
Praxair, Teledyne, Deloro Stellite, Sandvik, Westinghouse, Eutectic, Miller Electric,
J.W. Harris, Industrial Welding, and Airgas (collectively, the "seller Defendants"),
during some or all relevant times, manufactured, sold, or distributed welding
products that were supplied to Plaintiffs' work sites.

109.    Plaintiffs were exposed to welding fumes containing manganese
from products sold by the seller Defendants, while using the products and/or
working in the proximity of others using the products.

110.    The seller Defendants had the duty, as product sellers, to exercise
reasonable care for the safety of the Plaintiffs.

111.    These duties included the responsibility for the following safety and
health matters relating to welding fumes:

> A. the investigation of the health hazards;
>
> B. writing and publishing adequate and timely precautionary product
>    labels and other health and safety information;
>
> C. writing and publishing adequate and timely specifications and
>    standards about ventilation, safety equipment, and other
>    precautionary measures; and/or
>
> D. Such other acts of negligence and omissions as will be shown at
>    the trial of this matter.

112.    The Defendants knew, or in the exercise of reasonable care should have known, that welding fumes would cause neurological damage to welders and employees working in the proximity of others using the products such as Plaintiffs herein.

113.    The Defendants breached their duty of reasonable care to the Plaintiffs and were negligent, without regard to whether the acts were intentional, knowing, or reckless.

114.    Beginning in 1970, the Defendants violated OSHA standards about publication of information about health hazards through MSDS guidelines that omitted necessary instructions about target organs, ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

115.    The Defendants violated industry standards about health and safety as set forth in the Z49 documents adopted by the AWS-sponsored Z49.1 committee beginning in 1950 by failing to publish adequate and timely warning of precautionary instructions and other information to welders or persons in the proximity to welding fume about the standard.

116.    As a direct and proximate result of the Defendants' negligent acts and omissions, Plaintiffs have suffered, and continues to suffer, severe neurological injuries which require the medical monitoring of Plaintiffs, and Plaintiffs' spouses suffered damages for loss of consortium.

117.    WHEREFORE, the Plaintiff demands judgment in an amount deemed just and reasonable plus interest and costs against the Defendants.

## THIRD CLAIM FOR RELIEF
### (Strict Liability – Sale of Unreasonably Dangerous Product)

118.    Plaintiff and the putative class realleges paragraphs 1-117 as if fully set forth herein.

119.    The seller Defendants identified above manufacture, sell, or distribute welding products that produce, or cause the production of, manganese-containing welding fumes, that the products were expected to and did reach various locations in various States without substantial change in the condition in which they were sold.

120.    Plaintiffs were exposed to welding fumes containing manganese from products sold by the seller Defendants, while using the products or working in the proximity of others using the products.

121.    The seller Defendants' products are unreasonably dangerous because, when used for their reasonably foreseeable and intended purposes in the welding process, they produce harmful fumes that cause neurological injuries.

122.    The seller Defendants' products are defective because:

A.  adequate and timely warnings were not provided to users that the products produce harmful fumes;

B.  adequate and timely instructions were not provided to users about ventilation, safety equipment, or other precautionary measures;

C.  the Defendants failed to test or investigate the health hazards associated with the products;

27

    D. the design of the products does not protect the user from
exposure to the harmful fumes; and/or

    E. such other acts of negligence and omissions as will be shown at
the trial of this matter.

123.    The defects in the seller Defendants' products existed when the products left the Defendants' control.

124.    The defects in the seller Defendants' products were the proximate cause of the Plaintiffs' injuries and damages.

125.    At all relevant times, the Plaintiffs had no knowledge of the defects in the seller Defendants' products.

126.    WHEREFORE, the Plaintiff demands judgment in an amount deemed just and reasonable plus interest and costs against the Defendants.

## DAMAGES

127.    As a proximate result of all the Defendants' breaches of their duties to the Plaintiffs, Plaintiffs have sustained, and will sustain, welding fume-related injuries, conditions, and damages, including past and future pain and suffering; past and future medical treatment and medical expenses; past and future rehabilitation, life care expenses, and medical monitoring; past lost wages and future disability; past and future impairment of earning capacity; a diminution in his quality and enjoyment of life; and emotional distress.

## MEDICAL MONITORING

128.    Complainants and those similarly situated live in an ever-present fear that as a result of the exposure they will suffer adverse health consequences and/or disabling or terminal diseases in the future.

129.    All of the above considerations caused considerable fear, anguish, discomfort and inconvenience of complainants and those similarly situated, as well as injuries which required or require medical treatment and physical, mental and emotional damage. Consequently, Plaintiffs are entitled to medical monitoring at the expense of the defendants.

130.    The medical monitoring to which Plaintiffs are entitled include, but are not limited to, preventative screening, neurological and other testing, neurologists' and other physicians' evaluations, examinations and care and treatment of the resultant medical conditions.

131.    Plaintiffs' spouses and other spouses whom they represent have suffered, and will continue to suffer loss of consortium for the substantial interference in their relationship with the injured spouses, including loss of the aid, comfort, companionship, society, and services of the injured spouse.

132.    The claim of some of the plaintiffs herein is equal to $75,000.00 (Seventy Five Thousand Dollars) and the claim of some of the plaintiffs herein exceeds $75,000.00 (Seventy-Five Thousand Dollars).

133.    Plaintiffs herein rely solely and exclusively on state laws, and do not rely on nor invoke federal causes of action, federal law or regulation, nor federal questions in seeking their remedies.

## FOURTH CLAIM FOR RELIEF
### (Breach of Express Warranty)

134.    Plaintiff and the putative class realleges paragraphs 1-133 as if fully set forth herein.

135.    Defendants expressly warranted that its products were safe for its intended use.  Its products did not conform to these express representations, including, but not limited to, the representation that it was safe or as otherwise set forth in this complaint and/or in the Defendants' product materials.  As previously alleged, notice has been presented to the Defendants.  This breach of express warranty claim is asserted under Massachusetts General Laws Chapter 106, including, but not limited to 2-314 (implied warranty of merchantability usage of trade) and 2-315 (implied warranty for fitness of a particular purpose and 2-318 (with regard to the lack of privity any of the Defendants may claim), 15 U.S.C. §2310(d)(1), or alternatively, to any extent that the Magunson-Moss Act is found inapplicable, under UCC §2-314(2)(c).

136.    WHEREFORE, as a proximate cause and legal result of Defendants' wrongful conduct, Plaintiffs demand judgment against the Defendants determined to be allowed under the law by this Court in an amount sufficient to establish the jurisdiction of the Superior Court plus interest and costs and whatever further relief this Honorable Court deems appropriate.

## FIFTH CLAIM FOR RELIEF
### (Breach of Implied Warranty vs. Manufacturers)

137.    Plaintiff and the putative class realleges paragraphs 1-136 as if fully set forth herein.

138.    At all times material hereto, the Defendants marketed, sold and distributed its welding products and knew and promoted the use for which the aforesaid welding products were being used by Plaintiff and similarly situated members of the class and impliedly warranted to them that the aforesaid welding products were of merchantable quality and safe for their intended use.

139.    Plaintiff and similarly situated members of the class reasonably relied on the skill, expertise and judgment of the Defendants and their representations as to the fact that the welding products were safe for its intended use and of merchantable quality.

140.    The welding products supplied by the Defendants were neither safe for the intended use nor of merchantable quality, as warranted by these Defendants in that they had dangerous and life threatening side effects.

141.    The Defendants have received notice of the breach through this complaint and/or through previous demands which constitute notice under Massachusetts General Laws Chapter 106, including, but not limited to 2-314 (implied warranty of merchantability usage of trade) and 2-315 (implied warranty for fitness of a particular purpose and 2-318 (with regard to the lack of privity any of the Defendants may claim), 15 U.S.C. §2310(d)(1), or alternatively, to any extent that the Magunson-Moss Act is found inapplicable, under UCC §2-314(2)(c).

31

142.    The Defendants breached their implied warranty of merchantability in that the welding products were defective and not fit for the ordinary purpose it is used.

143.    As a proximate cause and legal result of Defendants' wrongful conduct, Plaintiffs and the class have incurred, and will continue to incur, expenses for: medical testing; health monitoring; biomedical care; behavioral, cognitive, linguistic and social therapies; diet modification; special educational programs; vocational training; and in severe cases, life-long institutional care or assisted living.

WHEREFORE, as a proximate cause and legal result of Defendants' wrongful conduct, Plaintiffs demand judgment against the Defendants for demand and/or for loss of consortium and as otherwise determined to be allowed under the law by this Court in an amount sufficient to establish the jurisdiction of the Superior Court plus interest and costs and whatever further relief this Honorable Court deems appropriate.

## SIXTH CLAIM FOR RELIEF
### (Negligence and Failure to Warn Against Manufacturer Defendants)

144.    Plaintiff and the putative class realleges paragraphs 1-143 as if fully set forth herein.

145.    The welding products defendants are manufacturers and/or sellers of welding products. They made these products and sold it to the distributor defendants, for the purpose of resale for ultimate use by welders.

32

146.    Despite the fact that they knew, or should have known, that the welding products would emit harmful toxic gases that cause neurological injury and that have cumulative affect they never warned of the health risks posed.

147.    By not providing these essential warnings, the defendant's failed to exercise ordinary care in the manufacture, promotion, distribution, and sale into interstate commerce of welding products.

148.    The Defendants were negligent in one or more of the following particulars:

    A.  Failing to use ordinary care in designing, manufacturing, sale and/or limits on recommended use and/or intended purposes welding product to avoid toxic levels of gases;

    B.  Failing to conduct adequate testing and post-marketing surveillance to determine the safety and side effects of the welding products;

    C.  Failing to adequately test and/or warn about the welding gases' serious side effects, potential risks, or the nature, scope, severity, and duration of its hazards;

    D.  Failing to timely inform the medical community and the public of new information as they became aware of it regarding the welding gases' potential risks, or of the nature, extent, scope, severity and duration of its serious side effects;

    E.  Promoting the safety of the welding products while failing to provide adequate warnings or disclose the full extent of the

known risks of the welding gases, of which they knew or should
have known; and

F. Delaying warnings of, and then failing to provide adequate
warnings about, the risks of welding gases, which would have
dissuaded plaintiff and similarly situated members of the class
from using its products.

149.   Although Defendants knew or should have known that their welding
product caused unreasonably dangerous gases, they manufactured and sold it
without warning.  At all times there were safer alternatives and safer choices.

150.   Plaintiff's harm and loss of consortium was a reasonably foreseeable
consequence of the defendant's negligence.

151.   Further, as a proximate cause and legal result of Defendants'
wrongful conduct, Plaintiffs (and the class if deemed just and reasonable) have
incurred, and will continue to incur, expenses for:  medical testing; health
monitoring; biomedical care;  behavioral, cognitive, linguistic and social therapies;
diet modification; special educational programs; vocational training; and in severe
cases, life-long institutional care or assisted living.

152.   WHEREFORE, as a proximate cause and legal result of Defendants'
wrongful conduct, Plaintiffs demand judgment against the Defendants for loss of
consortium and as otherwise determined to be allowed under the law by this Court
in an amount sufficient to establish the jurisdiction of the Superior Court plus
interest and costs and whatever further relief this Honorable Court deems
appropriate.

## SEVENTH CLAIM FOR RELIEF
### (Common Law Fraud Against Maker Defendants)

153.    Plaintiff and the putative class realleges paragraphs 1-152 as if fully set forth herein.

154.    Through fraudulent omissions, the Defendants falsely portrayed to Plaintiffs that they were providing products that were safe and effective, and that the benefits of substantially outweighed their risks.

155.    These Defendants concealed from and omitted from disclosure to Plaintiffs facts they knew about the toxic gases produced by the products during ordinary use. In the alternative, they knew that ordinary use produced toxic gases and rendered their product unsafe and dangerous, and that as a consequence their risks outweighed their benefits. Plaintiffs were also deprived the option of making this decision for themselves.

156.    The Defendants knew that the gases were dangerous and therefore were not effective for their purpose as they had represented. The welding products posed far greater risks than they disclosed, and were otherwise not fit for their intended purpose or as they had represented them.

157.    The Defendants were under a duty to disclose information to Plaintiff, the class, and the public at large, under the common law as well as laws requiring them not to engage in false and deceptive trade practices, and as otherwise alleged in this complaint.

158.    Defendants made false representations and misleading partial disclosures concerning the nature and quality of their product, which they had a

35

duty and have a continuing duty to correct. They were and are in a superior position to know the true state of the facts about the dangerous and defective nature of their product and their known risks.

159.    These knowing, willful, deliberate and/or intentional omissions or misrepresentations of material facts include, but are not limited to (in addition to what has been referred to within this complaint) the following:

> A. Suppressing, failing to disclose and mischaracterizing the known risks;
>
> B. Omitting material information;
>
> C. Failing to timely and fully disclose the actual results of tests and studies;
>
> D. Failing to issue adequate warnings which would disclose the nature and extent of the dangers concerning the risks and dangers;
>
> E. Failing to disclose that adequate and/or standard and/or generally accepted standards for testing had not been done;
>
> F. Failing to disclose that adequate and/or standard and/or generally accepted standards for post-marketing testing had not been done;
>
> G. Making the representations concerning the safety, efficacy and benefits without fully and adequately disclosing the underlying facts, which rendered such statements false and misleading.

160.    Plaintiffs did not know, and in the exercise of reasonable care, could not have discovered, the material facts and important information that the Defendants omitted and suppressed.

161.    As a result of the Defendants' fraud, suppression and omission of material facts, Plaintiffs acted to their detriment, which they would not have done had they been told the truth.

162.    WHEREFORE, as a proximate cause and legal result of Defendants' wrongful conduct, Plaintiffs demand judgment against the Defendants plus interest and costs and whatever further relief this Honorable Court deems appropriate.

### EIGHTH CLAIM FOR RELIEF
#### (Products Liability)
#### (Defective Design Against Defendant Manufacturers, and Distributors)

163.    Plaintiff and the putative class realleges paragraphs 1-162 as if fully set forth herein.

164.    The welding products were defective in design and/or formulation. When they left the Defendants' hands, they had foreseeable risks that exceeded the benefits associated with its design or formulation.

165.    Alternatively, the welding products manufactured and distributed were defective in design or formulation. When it left Defendants' hands, it was unreasonably dangerous and/or was more dangerous than an ordinary consumer would expect, and/or was dangerous.

166.    As a proximate cause and legal result of Defendants' wrongful conduct, Plaintiffs suffered a related loss.

167.    WHEREFORE, as a proximate cause and legal result of Defendants' wrongful conduct, Plaintiffs demand judgment against the Defendants as determined to be allowed under the law by this Court plus interest and costs and whatever further relief this Honorable Court deems appropriate.

## NINTH CLAIM FOR RELIEF
### (Punitive Damages Including Attorneys Fees and Expenses for Violation of 93A and 85J or Other State Law)

168.    Plaintiff and the putative class realleges paragraphs 1-167 as if fully set forth herein.

169.    The Defendant breached their implied and expressed warranties and their goods were not reasonably suitable for the ordinary use for which goods of their description were sold when used in accordance with adequate warnings and instructions. *Casagrande v. F. W. Woolworth Co.* (1960) 165 N.E.2d 109, 340 Mass. 552.

170.    In addition to what has already been set forth, the Defendants, unfairly, deceptively and in reckless disregard for the safety, health and welfare of the Plaintiff, sold welding products and continued to market and sell the welding products, and understated the harmful affects even when they knew or should have reasonably known that their products were causing injury and/or could cause future harmful health conditions to develop.

171.    The acts and omission of the Defendants, and each one individually, were so gross as to evidence a willful, unfair, deceptive, wanton and reckless disregard for the health and welfare of the Plaintiffs and all those similarly situated, and constitutes outrageous conduct.

38

172.    Consequently, the Plaintiffs are entitled to recovery of punitive damages in an amount sufficient to punish them for their egregious acts and to deter them from such conduct in the future.

173.    The inherent defects of these welding products were latent and self-concealing.

174.    Each of the unfair, deceptive, willful, wanton, negligent and grossly negligent acts of omission and commission of the Defendants, as set forth hereinabove, were a proximate cause of the injuries and damages suffered by the Plaintiffs.

175.    The injuries and damages include, but are not limited to the costs associated with the need to seek medical attention and to undergo diagnostic procedures for which they have incurred expenses and will incur expenses in the future and all other damages for loss allowed under the law.

176.    The conduct of the Defendants was otherwise unfair and deceptive and violative of 93A AND 231 85J.

177.    Defendants have acted in bad faith in the transactions described herein and the wrongful acts alleged demonstrate bad faith as defined under Massachusetts law with respect to the torts engaged in.

178.    Accordingly and as otherwise set forth in this complaint, Plaintiffs are entitled to recover reasonable attorney's fees and expenses of litigation in an amount to be proven at trial.

179.    WHEREFORE, as a proximate cause and legal result of Defendants' wrongful conduct, Plaintiffs demand judgment against the Defendants as

determined to be allowed under the law by this Court plus interest and costs and whatever further relief this Honorable Court deems appropriate.

180.    This action is appropriate for determination through the Class Action Procedure for the following reasons:

A.    The large number of potential claimants present a level of numerosity better handled through the class action procedure as opposed to a mass joinder of individual claims;

B.    The common issues of law and fact pertaining to the determination of fault and the liability for compensatory and exemplary damages predominate over the individual issue of quantum, and such issues are typical of similar claims;

C.    The determination of fault and the basis for assessment of compensatory and exemplary damage may be made in the class action without the necessity of proof at that time as to the amount of those damages, thereby establishing guidelines for settlement and/or subsequent trials in individual cases if necessary;

D.    Petitioners herein have sustained damages of the nature described hereinabove and are suitable representatives of the class;

E.    The Plaintiffs herein are represented by skilled attorneys who are experienced in handling mass torts and class actions, and who can be expected to handle this matter in an expeditious and economical matter to the best interests of the class membership;

F.   The class action procedure is the superior vehicle for the efficient disposition of the issues and claims herein presented.

WHEREFORE, Plaintiffs pray:

1.   That this action be certified as a class action, as alleged above, for the purposes of determining the common issue of liability for appropriate damages;

2.   That upon certification of the class action, the Court calls for the formulation of a suitable management plan;

3.   That after due proceedings had, and a trial by jury, there be judgment herein in favor of Plaintiffs and against defendants, for all damages which are reasonable in the premises, together with legal interest thereon from the date of judicial demand until paid, and for all costs of these proceedings;

4.   That the rights of the Plaintiffs and the members of the class to establish their entitlement to compensatory damages, and the amounts thereof, be reserved for determination in their individual actions when appropriate; and

5.   That Plaintiffs recover their costs for the prosecution of this class action.

THE PLAINTIFFS DEMAND A TRIAL BY JURY.

TONINO ACETO
By his Attorney

Robert J. Bonsignore, Esq.
BBO No. 547880
BONSIGNORE & BREWER
23 Forest Street
Medford, MA  02155
(781) 391-9400

Dated: 11/9/04

42